

## IN THE LUCAS COUNTY COURT OF COMMON PLEAS
### CIVIL DIVISION

KELLY THIBERT
2827 CHELTENHAM RD.
TOLEDO, OH 43606,

    Plaintiff

vs.

CITY OF OREGON, OHIO
c/o MAYOR MARGE BROWN
5330 SEAMAN ROAD
OREGON, OH 43616-2608

    and

THE OREGON DIVISION OF POLICE
c/o CHIEF RICHARD STAGER
5330 SEAMAN ROAD
OREGON, OH 43616-2608

    and

RICHARD STAGER, INDIVIDUALLY
AND IN HIS CAPACITY AS CHIEF
OF OREGON DIVISION OF POLICE
5330 SEAMAN ROAD
OREGON, OH 43616-2608,

    and

MARGE BROWN, INDIVIDUALLY
AND IN HER CAPACITY AS MAYOR
OF THE CITY OF OREGON, OHIO
5330 SEAMAN ROAD
OREGON, OHIO 43616-2608

    Defendants

CASE NO. CI0200807279

JUDGE: _____

**COMPLAINT WITH
JURY DEMAND ENDORSED
HEREON**



EXHIBIT A

# COMPLAINT

## INTRODUCTION

1. This is an action for money damages and injunctive relief arising from the defendants' employment actions against the plaintiff because of her sex and in retaliation for her complaints of sex discrimination and her participation as a witness in a former co-worker's sex discrimination lawsuit. These acts constitute violations of O.R.C. §§ 4112.02(A), 4112.02(I), and 4112.99, as well as 42 U.S.C. § 1983.

## PARTIES

2. Plaintiff Kelly Thibert is a female Ohio resident who has worked as a Police Officer in the City of Oregon Division of Police since March 1993, and has held the rank of Sergeant in the Division of Police since December 2002.

3. Defendant City of Oregon (hereinafter "City") is an Ohio municipality capable of suing and being sued, with its principal offices at 5330 Seaman Road, Oregon, Ohio 43616-2608. Defendant City of Oregon Division of Police (hereinafter "the Division") is the city's police department, which employs approximately forty-five (45) sworn officers. Upon information and belief, no more than four (4) women have ever served as sworn police officers in the Division at any one time. There are currently only three (3) women working as sworn Oregon police officers. The City and its Division are employers as defined by O.R.C. § 4112.01(A)(2).

4. Defendant Richard Stager was appointed Acting Chief of Police for the Division in December 2007, and was appointed Chief on a permanent basis on or about June 1, 2008. In his role as Acting Chief and Chief, Stager has been the chief law

enforcement officer of the City and was responsible for personnel practices and decisions related to uniformed police officers. At all times material defendant Stager acted within the scope of his authority as an agent of the municipal defendant and is an employer as defined by O.R.C. § 4112.01(A)(2). Defendant Stager and other agents of the Division and the City, at all times material, acted with reckless disregard for the rights of the plaintiff, and these acts were wanton and willful. These actions were motivated by Sgt. Thibert's sex, her participation in prior proceedings concerning allegations of discrimination, and her good-faith reports of discriminatory conduct. Chief Stager is sued personally and in his official capacity.

5. Mayor Marge Brown has been the Mayor of the City of Oregon at all relevant times. Mayor Brown is the chief executive of the City, and as such, has supervisory powers over the Division of Police. At all times material Brown acted within the scope of her authority as an agent of the municipal defendant and is an employer as defined by O.R.C. § 4112.01(A)(2). Defendant Brown and other agents of the City, including agents under her direct and indirect supervision, at all times material, acted with reckless disregard for the rights of the plaintiff, and these acts were wanton and willful. These actions were motivated by Sgt. Thibert's sex, her participation in prior proceedings concerning allegations of discrimination, and her good-faith reports of discriminatory conduct. Mayor Brown is sued personally and in her official capacity.

## FACTS

*Sergeant Thibert's Career with the Oregon Division of Police*

6.  Plaintiff Kelly Thibert was hired as a police officer in the Oregon Division of Police on March 29, 1993. At the time she was hired, Ms. Thibert had graduated from the University of Toledo police academy, passed the Ohio Peace Officer Training test, and acquired an associate's degree in law enforcement and a bachelor's degree in criminal justice.

7.  After completing the Division's Field Training program and completing a one-year probationary period as a new officer, Ms. Thibert was assigned to road patrol.

8.  After serving on road patrol for approximately five years, Ms. Thibert was assigned to the Division's detective bureau, where she served approximately three years as a detective.

9.  In December 2002, Ms. Thibert was promoted to the rank of sergeant. For approximately the next two-and-a-half years, she served as a sergeant on road patrol. Besides the supervision of road patrol officers, her duties as a road patrol sergeant also included oversight of the Division's bicycle patrol and administration of the Field Training program for new officers.

10. In July 2005, Sgt. Thibert applied for and received a position as Special Projects Sergeant, placing her in charge of the Division's training programs, grant-writing, community affairs, domestic violence, school resource officers, and other administrative functions. This position was ideal for Sgt. Thibert because its hours (Monday through Friday, 7 a.m. to 3 p.m.), corresponded well with her responsibilities as the custodial parent of her son, who is eight years old.

*The Candace Elliott Case*

11. The Division has been implicated in allegations of sex discrimination and retaliation for many years. In the early 1990s, Virginia Todd, one of the first female police officers ever to serve in the Division, and the first female to hold any command position, was passed over for promotion to Lieutenant. Prior to that promotion, the Division had filled open positions by choosing the candidate for promotion with the highest qualifying examination score. When Ms. Todd scored highest on the Lieutenant promotional exam, however, the Division chose to promote a less senior, less qualified male officer, then-Sgt. Richard Stager. After Ms. Todd's legal challenge resulted in the reversal of Stager's promotion, the City blatantly terminated her in retaliation for her complaint of sex discrimination. Ms. Todd was successful in reversing this termination through legal action. In 1999, further allegations of discrimination by Lt. Todd, led to a formal investigation and report, known as the "Hays Report."

12. In 2003, another female Oregon police officer, Candace Elliott, was terminated during her probationary period. While Ms. Elliott's termination was allegedly for performance-related reasons, the purported deficiencies in her performance paled in comparison to performance problems of many of her male peers, some of whom were in multiple automobile accidents or had committed dangerous violations of police tactics on patrol. These male peers were not terminated; instead, they were granted extended probationary periods and/or additional training. One of the Division's own supervisors wrote to the Chief regarding this double standard as to Ms. Elliott.

13. Ms. Elliott filed a lawsuit in the Lucas County Court of Common Pleas, alleging that her termination resulted from sex discrimination. Her allegations included a claim that one of her training officers, Patrolman Jeff Brown, the son of the City's mayor, began making unwarranted criticisms of Ms. Elliott's performance after she refused his sexual advances.

14. During the discovery phase of Ms. Elliott's lawsuit, other incidents of sex discrimination and sexual harassment of female officers by male officers, including senior officers, were uncovered. Some of these incidents involved Sgt. Thibert, including the following:

- In January 2002, after being promoted to Sergeant, during Sgt. Thibert's first day serving as a road patrol sergeant under the supervision of then-Sergeant Rick Stager, Stager stated that he and other men knew when a woman was having her period, and that he tries to avoid contact with women during their periods because they are more moody and emotional. He also stated that he tends to watch what he says around women because it is a known fact that they are more sensitive than men.

- In March 2002 through June 2002, a command officer in the Division spread false rumors that he had seen Thibert masturbating in front of a male officer, Patrolman Tyler Brown, during a training session.

- In October 2002, Thibert filed a complaint when another officer made an obscene hand gesture with respect to Ms. Thibert and Tyler Brown.

- In January 2003, then-Sgt. Stager told Tyler Brown that he should watch who he calls, because his cell phone records were being monitored and showed calls to Sgt. Thibert's house. He then told Brown, "I don't care if you're in love with her or if she gives you the best blow jobs you've ever had, you just need to cool it for a while," and instructed him to stay away from Sgt. Thibert.

- In September 2003, Sgt. Stager and another senior officer confronted Sgt. Thibert about her friendship with Patrolman Brown, and ordered her not to ride her motorcycle with Brown in the City of Oregon because the fact that she was female and he was male would lead to more rumors about their supposed relationship. Upon information and belief, no male officers were

       ever given similar advice about their non-work contacts with other male officers.

       In October 2003, Sgt. Thibert was given a direct order by a superior officer not to have any contact with Patrolman Brown unless it was work-related. No such "no-contact" order was ever given to a male officer as to another male officer.

15. When the Division's Chief at the time, Thomas Gulch, learned that these incidents of discrimination and harassment had become a subject of Ms. Elliott's litigation, he required Sgt. Thibert to file a written report of the incidents that she had knowledge of, which she did, in November 2003. Chief Gulch then asked an investigator from the Toledo Police Department, Deputy Chief Don Kenney, to conduct an investigation of a hostile work environment within the Division. Sgt. Thibert and other officers from the Division were interviewed by Deputy Chief Kenney about the allegations of sexual harassment. Deputy Chief Kenney made a report of his conclusions without even interviewing most of the witnesses to the incidents Sgt. Thibert had described, and no action was taken by the Division as a result of his investigation, except that Sgt. Thibert was investigated regarding unfounded allegations concerning her interactions with Patrolman Tyler Brown.

16. In February 2004, Sgt. Thibert was deposed in connection with Ms. Elliott's lawsuit. In that deposition, she testified regarding the sexually hostile work environment created by officers in the Division, including some or all of the incidents described above.

17. Around the time of the Kenney investigation and the Elliot depositions, then-Sgt. Stager ceased speaking to Sgt. Thibert altogether, even in work-related situations,

-7-

because of Sgt. Thibert's reports of a hostile work environment. This conduct has continued to the present, with the exception of only a few isolated incidents in which the circumstances made ignoring Sgt. Thibert impossible.

*Mayor Brown's Reaction to the Elliott Case and the Ensuing Investigations*

18. Following the Kenney Investigation and the Elliot depositions, Mayor Marge Brown began urging command officers in the Division to treat Sgt. Thibert's participation in the investigation and depositions as disloyalty to the Division, and to terminate or otherwise force her to leave the Division. Upon information and belief, these efforts to drive Sgt. Thibert out of the division have continued to the present.

19. Between 2004 and 2006, in various conversations with high-ranking Division officers, as well as with other City employees, including City Administrator, Ken Filipiak, Mayor Brown referred to Sgt. Thibert as a "turncoat."

20. In a public gathering at a prayer breakfast in or around May 2006, Mayor Brown referred to Sgt. Thibert and others who participated in the Elliott case as "nigger[s] in the woodpile" and "turncoats" because she suspected them of passing information to Candace Elliott during her litigation.

21. Filipiak sent at least one memorandum to the Division following the Elliott case suggesting that Sgt. Thibert should face official discipline for her participation in the case. Mayor Brown was aware of this memorandum. Upon information and belief, Filipiak was instructed by Mayor Brown to issue this memorandum suggesting discipline.

22. In 2007, Mayor Brown twice suggested that Sgt. Thibert be disciplined for an incident in which Brown witnessed Sgt. Thibert in allegedly inappropriate attire while on duty, despite knowing that Sgt. Thibert's attire was not improper and that other officers wore similar attire without facing discipline or recommendations of discipline.

*Chief Gulch's Investigation*

23. In the fall of 2007, Chief Gulch received at least two complaints generally directed against the upper management of the Division. One of the complaints was anonymous; the other was signed by representatives of the police officers' union, including Patrolman Jeff Brown, Mayor Brown's son. The complaints listed incidents of alleged misconduct, primarily by Sgt. Thibert, Lt. Hank Everitt, and another officer in the Division, Lt. Brian Andrzejewski, that had allegedly not been investigated by Gulch or other senior officers. Upon information and belief, Sgt. Thibert's conduct was made a subject of these complaints in an effort to drive her out of the Division because of her gender, her prior complaints of a hostile work environment, and in retaliation for her cooperation in the Candace Elliott case. The allegations of misconduct against Sgt. Thibert included the following:

- Sgt. Thibert was alleged to have exposed her breasts in public at a rock concert several years prior, while off-duty, although no witness was ever identified who would be able to confirm that this occurred at all, and other officers who attended the concert verified that no such incident occurred;

-9-

- Sgt. Thibert was alleged to have posed for inappropriate photographs for a motorcycle-themed calendar that reflected poorly on the Division, despite the fact that Ms. Thibert posed fully clothed, and not in department uniform, and only after specifically requesting permission to do so;
- Sgt. Thibert was alleged to have arrived at work in inappropriate attire on certain occasions, despite the fact that her attire was permitted by the Division's guidelines, and was consistent with the common practice among the Division's officers, and male officers, including then-Sgt. Stager, who engaged in similar conduct, were not investigated or disciplined;
- Sgt. Thibert was accused of having her hair braided by a fellow officer while on duty, even though this was not alleged to have interfered with her duty or the other officer's in any way, and the male officer who braided her hair was not disciplined or even investigated related to this incident; and
- Sgt. Thibert was accused of working out for an excessive number of hours during the week, although it was common for some male officers, including then-Sgt. Stager, to work out far in excess of the permitted hours without consequence.

24. In October 2007, Mayor Brown demanded Chief Gulch's resignation, and cited Chief Gulch's unwillingness to discipline or terminate Sgt. Thibert as a reason for her demand. Chief Gulch declined to resign, and was instead placed on probation.

25. Upon investigating the allegations in the anonymous complaint and the union complaint, Chief Gulch concluded that Sgt. Thibert was not guilty of any significant

--10--

violation of Division guidelines, and that most of the incidents that gave rise to the allegations of misconduct occurred, if at all, months or years before the complaints were made. Chief Gulch also acknowledged that he knew about the supposedly inappropriate photographs before they were taken, as Sgt. Thibert had asked his permission to appear in the calendar, and he had told her she did not need permission to engage in off-duty activities.

26. Chief Gulch also stated in his investigative report that his review of videotapes within the Division revealed that Sgt. Thibert's time spent exercising was not unusual and that his review of videotapes to ascertain this had demonstrated that several other officers, including Sgt. Stager, had been leaving their shifts early on a regular basis.

27. Chief Gulch also concluded that some of those responsible for bringing these incidents to his attention, including Patrolman Jeff Brown, were themselves guilty of misconduct for spreading rumors about fellow officers.

*Stager Becomes Chief and Immediately Begins Retaliating Against Sgt. Thibert*

28. In December 2007, after reaching these conclusions, which appeared to exonerate Sgt. Thibert and implicate Sgt. Stager and Patrolman Jeff Brown, but before finalizing his investigative report, Chief Gulch was removed from his position as Chief.

29. Chief Gulch was replaced by Stager, who became Acting Chief upon Gulch's removal, and was made Chief on a permanent basis on or about June 1, 2008. Upon information and belief, Stager was promoted in part because of his willingness

to continue the campaign to drive Sgt. Thibert out of the Division because of her gender, her prior complaints of a hostile work environment, and in retaliation for her cooperation in the Candace Elliott case. Stager was promoted over at least two higher ranked, more senior, and more qualified officers, Lt. Everitt and Lt. Andrzejewski.

30. Immediately upon his promotion to Acting Chief, Stager began using his new authority to threaten, harass, and inconvenience Sgt. Thibert in retaliation for her prior allegations of a sexually hostile work environment and her participation as a witness in the Elliott case. These actions included the following:

31. On December 10, 2007, only a few days after being named Acting Chief, Stager requested Sgt. Thibert's job description and notified her that he was changing her on-duty hours from 7am-3pm to 8am-4pm. Chief Stager knew that this shift change would affect Sgt. Thibert's childcare arrangements adversely, and that the shift change would not further any legitimate purpose of the Division. Other, male sergeants on the same shift as Sgt. Thibert did not have their hours changed.

32. On December 14, 2007, within a week of becoming Acting Chief, Stager instructed that Sgt. Thibert be ordered not to make any comments about her intention of hiring an attorney and/or suing the department in response to the rumors being spread about her related to the anonymous letter and Chief Gulch's investigation. Upon information and belief, no other officer was ever instructed not to speak with other officers about hiring an attorney.

33. On December 21, 2007, within two weeks of becoming Acting Chief, Stager transferred Sgt. Thibert from her assignment as Special Projects Sergeant to a less favorable assignment on road patrol. In her new assignment, Sgt. Thibert's schedule was changed such that she was required to work Wednesday through Sunday instead of Monday through Friday, severely affecting her childcare arrangements and curtailing the time she could spend with her son, particularly on weekends, and making it more difficult to take vacation. Such a transfer was inconsistent with the Division's practice and policy relating to transfers of assignments.

34. In his first all-command staff meeting as Acting Chief, Stager stated that in connection with the Candy Elliott depositions and the Kenney Investigation, certain officers in the Division told lies about other officers, and that he would not tolerate such conduct as Chief. Stager made these statements for the purpose of intimidating Sgt. Thibert and destroying her reputation among other officers, consistent with his efforts to drive her out of the Division in retaliation for her past complaints of discrimination.

35. Stager has specifically ordered that Sgt. Thibert is to be excluded from weekly staff meetings, despite including all other on-duty sergeants in such meetings.

36. Stager has instructed senior officers that no complaint by Sgt. Thibert was to reach his level, based on his knowingly false statement that she had a history of making frivolous complaints.

-13-

37. On several occasions since becoming Chief, Stager has issued discriminatory and baseless orders to Sgt. Thibert through her superior officers, including warning her against going outside the chain of command on repeated occasions when she was seen conversing with Lt. Everitt. Upon information and belief, officers of different ranks who are not in each other's chains of command speak to each other freely throughout the Division, and are never given similar orders or warnings.

38. On February 14, 2008, the City's law director, Paul Goldberg, and its administrator, Ken Filipiak, informed Sgt. Thibert in writing that as a result of Mr. Goldberg's completed investigation of the charges initially investigated by Chief Gulch, she had been charged with five (5) separate provisions of the division's manual, and that she would subject to "punitive disciplinary action up to removal." These charges resulted in Sgt. Thibert being sanctioned with a pending two-day suspension. Mr. Goldberg and Mr. Filipiak purposely overlooked similar and more serious conduct by other officers in the Division and failed to bring any charges against these other officers, including Stager and Patrolman Jeff Brown, both of whom were specifically identified by Chief Gulch as having committed misconduct. Mr. Goldberg and Mr. Filipiak also failed to take action for the knowing filing of false and frivolous complaints against Sgt. Thibert, in violation of the Division's general orders.

39. Each of the above-described actions was directed by Chief Stager, the Division, and the City against Sgt. Thibert because of her sex and in retaliation for her past complaints of a hostile work environment and her participation in Candace Elliott's case.

40. The conduct described above has created a discriminatory hostile work environment within the Division, directed particularly toward Sgt. Thibert.

41. As a direct and proximate result of the conduct of the defendants and their officers, employees, and agents, plaintiff has suffered expense and lost benefits, loss of reputation, quality of life, humiliation, embarrassment, mental anguish and distress for which she should be compensated.

42. Defendants discriminated against Sergeant Thibert in the terms and conditions of her employment.

43. At all times material to this action, the defendants' actions were wanton, willful and in reckless disregard for the rights of the plaintiff and motivated by the plaintiff's gender and her participation as a witness in Ms. Elliott's lawsuit.

### FIRST CLAIM FOR RELIEF

44. The above paragraphs are realleged as if fully rewritten herein.

45. The defendants' actions constitute unlawful sex discrimination, in violation of Ohio Revised Code Chapters 4112.02(A) and 4112.99.

### SECOND CLAIM OF RELIEF

46. The above paragraphs are realleged as if fully rewritten herein.

47. The defendants' actions constitute unlawful retaliation, in violation of Ohio Revised Code Chapters 4112.02(I) and 4112.99.

### THIRD CLAIM FOR RELIEF

48. The above paragraphs are realleged as if fully rewritten herein.

49. The defendants' actions constituted discrimination on the basis of sex, and retaliation for making complaints and participating in investigations of sex discrimination, both of which are prohibited by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

50. The defendants' actions were at all relevant times conducted under color of state law.

51. The defendants' actions constitute violations of 42 U.S.C. § 1983.

**WHEREFORE,** the plaintiff respectfully requests that she be reinstated to her assignment as Special Projects Sergeant, awarded compensatory and punitive damages in excess of $25,000.00 (twenty-five thousand dollars), and the costs of this action, including reasonable attorney fees. The plaintiff also requests that the defendants be enjoined from further acts of discrimination and retaliation, and all other appropriate relief.

Respectfully submitted,

*/s/ Frederick M. Gittes (RG)*

Frederick M. Gittes (0031444)
Jeffrey P. Vardaro (0081819)
THE GITTES LAW GROUP
723 Oak Street
Columbus, Ohio 43205
(614) 222-4735
FAX: (614) 221-9655
Attorneys for Plaintiff

*Signed by R. Kevin [illegible] (0013917) attorney at Law w/ express consent of Frederick M. Gittes on 10/6/08 via telephone*

## JURY DEMAND

The Plaintiff demands a jury to hear and decide all issues of fact in this case.

*Frederick M. Gittes (PLG)*
Frederick M. Gittes

*Per Telephone Authority
10/6/08 by R. Sean [illegible] (0013017)
Attorney at Law on behalf
of Frederick M. Gittes*