IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Kelly Thibert,                                             Case No. 3:08 CV 2431

                              Plaintiff,          MEMORANDUM OPINION
                                                  AND ORDER

              -vs-
                                                  JUDGE JACK ZOUHARY
City of Oregon, Ohio, et al.,

                              Defendants.


                              **INTRODUCTION**

        Plaintiff Kelly Thibert brings hostile work environment, sex discrimination, and retaliation

claims against Defendants the City of Oregon, Police Chief Richard Stager ("Stager"), and former

Mayor Marge Brown ("Mayor Brown").  Currently pending is Defendants' Motion for Summary

Judgment (Doc. No. 66).  Plaintiff filed an Opposition (Doc. No. 103), and Defendants filed a Reply

(Doc. No. 121).  For the following reasons, Defendants' Motion is granted in part and denied in part.

                              **BACKGROUND**

        Plaintiff became an officer in the Oregon Police Division ("Division") in March 1993.  The

Division is organized into two sections, Operations and Support Services.  Operations includes Road

Patrol officers, and Support Services includes dispatchers, record clerks, detectives, and a Special

Projects Sergeant.  Plaintiff began her career as a Road Patrol officer.  In August 1999, she was

transferred to the detective bureau.  In December 2002, Plaintiff was promoted to Sergeant and

returned to Road Patrol.  In July 2005, Plaintiff was named Special Projects Sergeant, where her

duties included overseeing the Division's training programs and its school resource officers.  In

January 2008, she was transferred back to Road Patrol -- the action at the center of this case.  She currently remains a Road Patrol Sergeant.

By all accounts, Plaintiff has performed her official duties effectively.  However, her personal relations with other officers in the Division have not always been smooth.  These conflicts first came to light during a prior sex discrimination lawsuit against the Division by Officer Candace Elliot ("Elliot").  Elliot filed her suit in March 2003 after her employment was terminated.  As part of discovery in the Elliot suit, various officers testified in depositions that Plaintiff had made informal complaints about sexual harassment.  Tom Gulch ("Gulch"), the Division's Chief at the time, required Plaintiff to put her allegations in writing after he became aware of the officers' testimony (Doc. No. 81-2, Ex. S).  Plaintiff complied, sending a written complaint to Gulch in November 2003 (Doc. No. 81-2, Ex. T).

Much of Plaintiff's written complaint concerned rumors among Division employees about the close relationship between Plaintiff and Officer Tyler Brown ("Officer Brown") (apparently no relation to Mayor Brown), another officer in the Division.  Workplace discussion involved whether the relationship was appropriate from a professional standpoint (Plaintiff was Officer Brown's supervisor at times) and a personal standpoint (both were married to others during 2002-03).  Plaintiff admits that she eventually began dating Officer Brown in early 2004, after she separated from her husband, but she claims they were merely friends before then (Plaintiff Dep., p. 62).

One incident involving Plaintiff and Officer Brown received particular attention in the rumor mill during the spring and summer of 2002: Plaintiff was said to have made a gesture resembling masturbation toward Officer Brown during a training session in December 2001 (Plaintiff Dep., pp. 110-17).  Plaintiff claims she was merely gesturing to Officer Brown to zip up his fly, and that the

2

gesture was grossly misinterpreted by Lieutenant Brian Andrzejewski ("Andrzejewski"), who then spread the masturbation rumor.  Andrzejewski believes that Plaintiff did make a gesture resembling masturbation, and he denies starting any rumors; he claims he merely reported the incident to Plaintiff's supervisor the next day (Andrzejewski Dep., pp. 95-103).

Plaintiff's written complaint to Gulch also alleged that Andrzejewski and Stager (then a Road Patrol Sergeant) made several inappropriate comments about her relationship with Officer Brown. In January 2003, Stager allegedly told Officer Brown, "I don't care if you're in love with [Plaintiff] or if she gives you the best blow jobs you've ever had, you just need to cool it for a while" (Ex. T, p. 4).  In September 2003, Stager and Andrzejewski both told Plaintiff that she needed to be careful about the appearance of her relationship with Officer Brown.  In October 2003, Andrzejewski allegedly told Plaintiff that she was to have absolutely no contact with Officer Brown except for work-related matters.  Stager and Andrzejewski deny the specifics of these statements, though they acknowledge discussing the propriety of the relationship with both Plaintiff and Officer Brown (Stager Dep., pp. 69-70, 76-77; Andrezejewski Dep., p. 113).  Finally, Plaintiff's written complaint recounted an incident in 2002 in which Stager told her that women officers were more sensitive to criticism than men, that he could tell when women were on their periods, and that he tried to avoid women during those times (Plaintiff Dep., p. 54).

Plaintiff made many of these same sexual harassment allegations during her own deposition testimony in the Elliot case, which occurred in three sessions between 2004 and 2005 (Plaintiff Aff. ¶ 11).  In those depositions, she also testified about male officers who were treated more favorably than Elliot.  The Elliot case settled in 2005.

In response to Plaintiff's allegations, Gulch asked an officer from another police department to conduct an investigation. That investigation resulted in a February 2004 report, which concluded that Plaintiff's allegations of sexual harassment were "unfounded," and that "[i]t is obvious that the relationship/friendship of [Plaintiff] and Officer Brown has presented problems within the Oregon Police Department" (Doc. No. 83., Ex. 8, pp. 47-48). After this report was presented, Ken Filipiak ("Filipiak"), the City Administrator, expressed concerns about the report's findings, including the apparent relationship between Plaintiff and Officer Brown (Doc. No. 84, Ex. 14). Gulch responded by ordering an internal investigation, and that follow-up report found no wrongdoing by Plaintiff (Doc. No. 84, Ex. 13; T. Gulch Dep., pp. 21-22).

Following Plaintiff's written complaint in November 2003, Stager stopped talking to Plaintiff (Stager Dep., pp. 86-87; Shaw Dep., p. 49). Even now, Stager avoids her at work; for example, he will leave the workout room if Plaintiff enters (Stager Dep., p. 199). He admits he was "frustrated" with Plaintiff's allegations against him (Stager Dep., p. 85). Mayor Brown also expressed a negative attitude towards Plaintiff and Lieutenant Hank Everitt ("Everitt"), another officer that had testified on Elliot's behalf. Mayor Brown referred to Everitt as a "turncoat" (Brown Dep., p. 77), and Gulch recalls her applying the "turncoat" label to Plaintiff as well (T. Gulch Dep, pp. 25-26). Mayor Brown admits she may have called Plaintiff a "turncoat" on at least one occasion (Brown Dep., p. 79). Gulch also recalls Mayor Brown telling him "she would like to be rid of [Plaintiff] and Lieutenant Everitt from the police department" (T. Gulch Dep., p. 36). Mayor Brown denies making these statements (Brown Dep., p. 77). However, she does admit refusing to consider Everitt for the new chief position because of his testimony in the Elliot case (Brown Dep, p. 81). In addition, Mayor Brown reportedly made a public comment in 2006 that she "smelled a nigger in the woodpile," apparently referring to

4

Plaintiff and Everitt (V. Gulch Dep., pp. 6-10).  Mayor Brown denies making that statement (Brown Dep., p. 79).

In 2005, Plaintiff successfully bid into the open position of Special Projects Sergeant, an administrative position under Everitt's chain of command.  This was a day-shift position with set hours of 7 am to 3 pm.  Plaintiff appreciated the fixed hours, as they allowed her to spend time with her son and minimize childcare expenses.  Plaintiff also appreciated the safer environment, and she believed the position improved her prospects for promotion.  Plaintiff acknowledges that her overall work environment improved greatly between 2005 and 2007.

The fall of 2007 saw renewed tensions at the Division.  On October 4, Mayor Brown and other city officials received an anonymous letter containing complaints about Plaintiff and Everitt (Doc. No. 83, Ex. 4).  The letter alleged Plaintiff had posed provocatively in a Harley Davidson calendar, had exposed her breasts at a local concert, and had been arrested for driving while intoxicated (which had subsequently been covered up by Everitt).  It also alleged that Plaintiff and Everitt often arrived late to work and violated the Division's workout time limits.

On October 10, Mayor Brown told Gulch she did not like his "management style" and asked him to resign, citing, among other things, a number of Plaintiff's alleged indiscretions that Gulch had not punished (T. Gulch Dep., pp. 34-35; Filipiak Dep., pp. 117-18).  Gulch did not resign, and the Mayor placed him on three months' "probation."  Gulch then investigated the rule violations alleged in the anonymous letter, confirming some but finding no evidence for others; he also found that other officers (including Stager) had violated similar rules.  Gulch shared his findings with Mayor Brown (T. Gulch Dep., pp. 47-50).

5

In the meantime, City Law Director Paul Goldberg and City Administrator Ken Filipiak conducted interviews of Division staff and prepared a report evaluating overall morale at the Division (Doc. No. 85, Ex. 23). After Mayor Brown reviewed this report in early December 2007, she suspended Gulch and appointed Stager as Acting Chief.

On Stager's first day in office, he changed Plaintiff's work hours from 7 am - 3 pm to 8 am - 4 pm. Soon thereafter, Stager eliminated the Special Services Sergeant position and transferred Plaintiff to Road Patrol, effective January 2008 -- a position she still holds today. Plaintiff no longer has weekends off, and she now works the midnight shift. Plaintiff claims this schedule adversely affects her childcare arrangements, that the Road Patrol position is more dangerous, and that the Road Patrol position limits her opportunities for advancement (Thibert Aff. ¶ 27).

Defendants took a number of other actions against Plaintiff in late 2007 and early 2008: Stager refused to include her in Division staff meetings, her file was "papered" with two reprimands for rule violations, and she was suspended for two days for rule violations, though the suspension was never served and was later withdrawn through union arbitration. Suffice to say, the parties dispute the basis for these actions: Defendants claim the reprimand and rule violations were justified, while Plaintiff believes she was held to a higher standard than other officers (including Stager) who violated similar rules. [1]

---

[1]

The record in this case includes well over two thousand pages of deposition transcripts from eighteen different witnesses (nearly a third of the Division's employees), and thousands more pages of affidavits and documents. This Court has attempted to present those facts it believes to be most important, and many facts highlighted by both parties' briefs have necessarily been omitted. These omissions are not meant to comment on the potential relevance of certain evidence at trial, but rather to focus on the critical issues for summary judgment.

## STANDARD OF REVIEW

Pursuant to Federal Civil Rule 56(c), summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." *Id*. When considering a motion for summary judgment, the court must draw all inferences from the record in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

## DISCUSSION

Plaintiff brings claims for hostile work environment, sex discrimination, and retaliation under 42 U.S.C. § 2000e *et seq* (Title VII), Ohio Revised Code § 4112.02, and 42 U.S.C. § 1983. First, some housekeeping: Title VII does not impose liability on individuals, *Wathen v. General Elec. Co.*, 115 F.3d 400, 405 (6th Cir. 1997), but R.C. § 4112.02 does impose individual liability, provided the individuals are supervisors or managers, *Genaro v. Cent. Transport, Inc.*, 84 Ohio St. 3d 293, 296 (1999). Accordingly, the Title VII claims against Stager and Mayor Brown are dismissed, while the state law claims remain. The Title VII claims against the City, and the R.C. § 4112.02 claims against the City, Stager, and Mayor Brown, are all analyzed under the same framework. *Hampel v. Food Ingredients Specialties, Inc.*, 89 Ohio St. 3d 169, 175 (2000). The Section 1983 claims are analyzed separately below.

**Hostile Work Environment (Title VII and Ohio Law)**

To establish a hostile work environment claim, Plaintiff must show that "'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560 (6th Cir. 1999) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  Title VII's prohibition on harassment is not a "general civility code"; rather, it "forbids only behavior so objectively offensive as to alter the conditions of the victim's employment."  *Oncale v. Sundowner Offshore Sers.*, 523 U.S. 75, 81 (1998) (internal quotation omitted).  "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious)" are not actionable under Title VII.  *Farragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation and citation omitted); *see also Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 790 (6th Cir. 2000) (finding no hostile work environment when "sum total" of supervisor's alleged actions were several dirty jokes, one verbal sexual advance, a one-time reference to the plaintiff as "Hot Lips," and isolated comments about the plaintiff's dress).

In this case, Plaintiff has identified just two incidents (over her seventeen-year career at the Division) that could be construed as sexual harassment.  First, then-Sergeant Stager told her that he could tell when women were on their periods and that women were more sensitive to criticism than men.  Second, Andrzejewski allegedly spread a rumor about Plaintiff masturbating in front of Officer Brown.  Plaintiff has not alleged that any co-worker or supervisor ever made an unwelcome sexual advance.  Though offensive, these isolated incidents are similar in nature and frequency to the comments in *Morris*, where the court held as a matter of law that the harassment could not support a hostile work environment claim.  In sum, there are no facts to support a "severe and pervasive"

8

environment of sexual harassment, and Defendants therefore are entitled to summary judgment on this claim.

### Sex Discrimination (Title VII and Ohio Law)

Plaintiff's sex discrimination claim is analyzed under the *McDonnell Douglas* burden shifting framework.  Plaintiff must first establish a prima facie case, which generally requires (1) she is a member of a protected class, (2) she was subjected to an adverse employment decision,  (3) she was qualified for the position, and (4) similarly situated males were treated more favorably.  *Peltier v. U.S.*, 388 F.3d 984, 987 (6th Cir. 2004).  Here, the primary adverse employment decision identified by Plaintiff is the elimination of the Special Projects Sergeant position and her consequent transfer to Road Patrol.  Because that position was eliminated and Plaintiff has not been replaced, this case should be analyzed under a reduction in force framework, even though Plaintiff was not terminated. *See Wilson v. Ohio*, 178 F. App'x 457, 465 (6th Cir. 2006) ("There is no requirement that a [reduction in force] involve terminations; a [reduction in force] merely requires that positions be eliminated."). Under a reduction in force analysis, the fourth element of the prima facie case is modified, and Plaintiff, instead of comparing herself to similarly situated males, must present "'additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons.'"  *Id.* (citing *Barnes v. GenCorp., Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990).

Plaintiff has not produced evidence that her position was singled out for elimination because of her sex and therefore has failed to establish a prima facie case.  Plaintiff asserts that she has "more than satisfied" her burden (Doc. No. 103, p. 28), but she never explains why Defendants singled her out because of her gender.  To be sure, there is ample evidence of personality conflicts within the

Division, including between Plaintiff and Stager, but Plaintiff must show more than a personality conflict. *See Murphy v. Univ. of Cincinnati*, 72 F. App'x 288, 294 (6th Cir. 2003) ("Plaintiff has not shown direct or prima facie evidence of discrimination based on sex, but simply a personality conflict . . . which is not actionable."). Plaintiff also claims that Stager harbors an "express bias" against women, but that characterization overstates the evidence in the record. There is no evidence that Stager treated female officers poorly (apart from his admitted conflict with Plaintiff) or that his beliefs about women led to the elimination of the Special Projects Sergeant position.[2]

### Retaliation (Title VII and Ohio Law)

Though both parties proceed under the *McDonnell Douglas* burden-shifting framework for Plaintiff's retaliation claim, it is clear that Plaintiff has adduced *direct* evidence of retaliatory animus. Accordingly, the *McDonnell Douglas* approach, used to evaluate cases based on *circumstantial* evidence, is inappropriate. "In contrast to purely circumstantial cases of retaliation, an employee who has presented direct evidence of improper motive does not bear the burden of disproving other possible nonretaliatory reasons for the adverse action." *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 382 (6th Cir. 2002). When an employee presents direct evidence, "the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive." *Id.*

Here, the alleged statements of Stager and Mayor Brown, if believed by the jury, could be direct evidence of retaliatory motivation. When Plaintiff and her union representative met with Stager to discuss her transfer to Road Patrol, she asked him whether the transfer was connected to her

---

[2] Defendants claim Thibert was transferred to save costs, and to maintain the same number of Road Patrol Sergeants after Stager was promoted to Acting Chief. Because Plaintiff has not established a prima facie case of discrimination, this Court need not address these proffered reasons, nor whether they were pretextual.

allegations of sexual harassment; Stager reportedly replied "I'm not the one who put things in writing." That statement, if believed, indicates a direct causal connection between Plaintiff's written harassment complaint and her transfer to Road Patrol. Similarly, Mayor Brown allegedly referred to Thibert as a "turncoat" and allegedly encouraged Gulch to get rid of both officers. Whether Stager and Mayor Brown in fact said those words, and what they meant by them, are for the jury to decide. Because a reasonable jury could construe those statements as direct evidence of retaliation, and because those statements are disputed issues of material fact, summary judgment is inappropriate.

Though Plaintiff has produced direct evidence of retaliatory motive, she still must show that Defendants' actions were "materially adverse" to her. For a retaliation claim to be actionable, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006) (internal quotation and citation omitted). "Petty slights[,] minor annoyances[,] . . . personality conflicts at work[, or] snubbing by supervisors and co-workers" will not support a retaliation claim. *Id.*

In some cases, reassignment of job duties is sufficient to support a retaliation claim. *Id.* at 71. "Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Id.* at 71 (internal quotation and citation omitted). For example, in *Burlington Northern*, a female railroad worker was transferred from her forklift operator position to a track laborer position following her complaint about sexual harassment. *Id.* at 58. There was evidence that "the track laborer duties were . . . more arduous and dirtier; that the forklift operator

11

position required more qualifications, which is an indication of prestige; and that the forklift operator position was objectively considered a better job and the male employees resented [the plaintiff] for occupying it." *Id.* at 71 (internal quotation and citation omitted).  The Supreme Court found that "a jury could reasonably conclude" that such a reassignment would have been "materially adverse."  *Id.*

Here, a jury could reasonably conclude that Plaintiff's reassignment to Road Patrol was materially adverse, because it would have "dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Id.* at 68.  As in *Burlington Northern*, there is evidence in the record that the Road Patrol position, even though it was still a Sergeant's position, was objectively less favorable than the Special Services position (i.e., more dangerous, less chance for promotion, adverse effect on childcare).  *See id.* at 69 ("A schedule change . . . may matter enormously to a young mother with school-age children.").

Defendants do not dispute that the two positions involve different duties.  Rather, Defendants dispute Plaintiff's characterization of these differences; for example, Defendants assert that all police jobs are potentially dangerous and that Plaintiff therefore cannot complain about the risks associated with Road Patrol.  But this Court cannot resolve such disputes on summary judgment.  Whether Stager's reassignment of Plaintiff to Road Patrol constitutes a materially adverse action is an appropriate question for the jury.[3]

Defendants cite this Court's decision in *Baker v. City of Toledo*, No. 3:05 CV 7315, 2007 WL 1101254, for the rule that a mere shift change cannot be deemed an adverse action, even if that change

---

[3] Though the decision to reassign Plaintiff was made by Stager, there is sufficient evidence for a jury to infer that Mayor Brown influenced Stager's decision.  Gulch testified that Mayor Brown encouraged him to get rid of Plaintiff.  Gulch's testimony, coupled with Mayor Brown's alleged statements and her position of authority, is enough for a jury to conclude that Mayor Brown influenced Plaintiff's reassignment.

in work times significantly impacts an employee's childcare arrangements.  However, *Baker* is distinguishable from the instant case for two reasons.  First, the analysis of the schedule change in *Baker* involved a sex discrimination claim, not a retaliation claim.  *Id.* at *4-*5.  Accordingly, the question in *Baker* was whether there was an adverse *employment* action.  *Id.*  However, for a retaliation claim, an adverse action need not occur at work or be related to employment, so effects on family life may be appropriate considerations.  *Burlington N.*, 548 U.S. at 57, 69.  Second, the plaintiff in *Baker* merely changed schedules; there was no material change in her job duties.  But in the instant case, Plaintiff's job duties changed substantially once she was transferred.  In sum, *Baker* does not affect the analysis here.

In addition to her transfer to Road Patrol, Plaintiff argues a number of other actions are also materially adverse: Stager's refusal to include her in staff meetings, the "papering" of her file with two reprimands in December 2007, and a two-day suspension for rule violations (which was never served and was later withdrawn).  However, because Plaintiff's reassignment to Road Patrol, by itself, could be viewed by a jury as materially adverse, this Court need not decide whether these additional actions, alone or collectively, also satisfy the material adversity standard.  In any event, they may be appropriately considered by a jury, as they potentially lend force to Plaintiff's retaliation claim.

### Section 1983 claims

The claims brought under 42 U.S.C. § 1983 require separate consideration.  First, as to the Section 1983 claims against the City, Plaintiff fails to allege that she was harmed by a "policy or custom" of the City, which is required for municipal liability under Section 1983.  *See Gregory v. Shelby County, Tenn.*, 220 F.3d 433, 441 (6th Cir. 2000) (citing *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978).  Accordingly, the 1983 claim against the City is dismissed.

13

As to the hostile work environment and sex discrimination claims against Stager and Mayor Brown, those claims under Section 1983 require the same showing as the parallel claims under Title VII.  *Risinger v. Ohio Bureau of Workers' Compensation*, 883 F.2d 475, 483-84 (6th Cir. 1989) (hostile work environment); *Smith v. City of Salem*, 378 F.3d 566, 577 (6th Cir. 2004) (disparate treatment).  Thus, because those claims fail under the Title VII analysis, explained above, they also fail under Section 1983.

That leaves the Section 1983 retaliation claim against Stager and Mayor Brown.  Unlike employment discrimination claims, where plaintiffs may bring parallel claims under Title VII and Section 1983, *see Risinger*, 883 F.2d 475, 483-84, employer retaliation is not a valid claim under Section 1983, *see Day v. Wayne County Bd. of Auditors*, 749 F.2d 1199, 1205 (6th Cir. 1984).  An exception exists for First Amendment retaliation by public employers.  *See Birch v. Cuyahoga County Probate Court*, 392 F.3d 151, 168 (6th Cir. 2004) ("[A]rguably the First Amendment to the Constitution independently protects a government employee from retaliation for complaints about discriminatory employment practices, which are a matter of public concern."); *Ratliff v. DeKalb County, Ga.*, 62 F.3d 338, 340 (11th Cir. 1995) ("The right to be free from retaliation is clearly established as a *first amendment* right and as a *statutory* right under Title VII; but no clearly established right exists under the *equal protection* clause to be free from retaliation.") (emphasis in original).  However, in this case, Plaintiff never invokes the First Amendment.  Rather, Plaintiff's Section 1983 retaliation claim is based on a violation of the equal protection clause  (*see* Doc. No. 38, ¶¶ 50-52).  Because such a claim is not cognizable under Section 1983, it is likewise dismissed.

14

## Conclusion

Defendants' Motion for Summary Judgment is granted in part and denied in part.  The claims remaining for trial are retaliation by the City under Title VII, and retaliation by the City, Stager and Mayor Brown under Ohio Revised Code § 4112.02.  All other claims are dismissed.

IT IS SO ORDERED.

____s/ <i>Jack Zouhary</i>____
JACK ZOUHARY
U. S. DISTRICT JUDGE

July 15, 2010
